Richmond

## KAYHOE CONSTRUCTION CORPORATION

### V.

## UNITED VIRGINIA BANK

August 30, 1979.

Record No. 770951.

Present: All the Justices.

*Archibald Wallace, III; Albert M. Orgain, IV (Sands, Anderson, Marks & Miller,* on briefs), for plaintiff in error.

*James E. Farnham (Gordon F. Rainey, Jr.; Hunton & Williams,* on brief), for defendant in error.

HARMAN, J., delivered the opinion of the Court.

This controversy arose over payments made by a subcontractor, C & T Mechanical Corporation (C & T or subcontractor), to a bank, United Virginia Bank (Bank), from funds received as partial payments from the general contractor, Kayhoe Construction Corporation (Kayhoe or general contractor), under two construction subcontracts. Kayhoe, in its own behalf, and on behalf of C & T's unpaid suppliers and subcontractors[1], sought to recoup and recover partial payments made by Kayhoe to the subcontractor. C & T, in turn, paid these funds over to Bank, which held a perfected security interest in and to certain contract rights, accounts receivable and the proceeds therefrom of C & T. The trial court, after hearing the case on stipulations of fact, entered judgment for Bank and the general contractor appealed.

Kayhoe was the general contractor on two construction projects involving commercial property in Henrico County. In August, 1975, Kayhoe and C & T entered into two written agreements, one for each project, whereby C & T undertook, for an agreed consideration in each instance, to provide all labor, material, equipment, tools and services necessary to install all plumbing, heating, air conditioning, ventilation and electrical equipment required by the plans and specifications for each project. C & T, because of financial difficulties, ceased doing business on January 12, 1976. It filed a voluntary petition in bankruptcy on February 26, 1976.

---

[1] For purposes of this litigation, Bank has stipulated that Kayhoe has standing to assert the rights of C & T's unpaid suppliers and subcontractors.

When it abandoned its contracts with Kayhoe on January 12, 1976, C & T was indebted to thirteen suppliers and subcontractors for materials furnished or services performed on the Kayhoe projects. These unpaid suppliers and subcontractors notified Kayhoe and the property owners of their respective claims. At the time this action was instituted, they were in the process of perfecting their mechanic's liens on the real estate. This action was originally instituted by Kayhoe against C & T and Bank, but a nonsuit was subsequently entered on the claim against C & T.

For a number of years prior to August, 1975, and thereafter until the following December, Bank had been lending money to C & T. These loans were secured by a security interest in C & T's accounts receivable, contract rights and the proceeds therefrom, with exceptions not relevant here, pursuant to an "Accounts Receivable and Contract Rights Security Agreement" dated February 26, 1966. It was stipulated that the security interest under this agreement was duly perfected and continued by the requisite filings under the effective provisions of the Uniform Commercial Code.

Upon receipt of money subject to the security interest, C & T deposited such receipts in a special account designated "collateral account" at the Bank. The funds so deposited were applied by Bank to repayment of its loans to C & T.

C & T's total contract price for the two projects was $51,657. Progress payments on the projects totaling $43,574.26 were made by Kayhoe to C & T and deposited by it in the collateral account. Between August 11, 1975, and January 2, 1976, loans totaling $524,000 were extended to C & T by Bank.

At the time the progress payments on the two projects were deposited in the collateral account and applied by Bank to reduce C & T's loans, Bank was not aware that C & T had failed to meet its obligations to suppliers and subcontractors on the two projects. The Bank, of course, was aware that C & T was obligated by its agreement with Bank to deposit payments received from almost all of its accounts receivable and contract rights in the collateral account.

Here, as before the trial court, the general contractor argues two legal theories under which it says it was entitled to recover the payments received by the Bank from the progress payments made by Kayhoe to C & T.

The primary theory advanced by Kayhoe is that the progress payments made to C & T were "impressed with a trust for the benefit of those having potential mechanic's lien claims." Such a trust, Kayhoe

says, is created by the provisions of Code §§ 43-13[2], -19[3].

In support of its argument, Kayhoe cites cases from three of our sister states, Michigan[4], Texas[5], and Wisconsin[6]. We find these cases inapposite because in each of those jurisdictions the mechanics' lien statute expressly created a trust in the funds paid over to a contractor or subcontractor for the benefit of his materialmen and laborers.

No such provision is contained in our statute. In *Overstreet* v. *Commonwealth,* 193 Va. 104, 67 S.E.2d 875 (1951), we had occasion to

---

[2] Code § 43-13 provides:

"Any contractor or subcontractor who shall, with intent to defraud, retain or use the funds, or any part thereof, paid by the owner or his agent, the contractor or lender to such contractor or by the owner or his agent, the contractor or lender to a subcontractor under any contract for the construction, removal, repair or improvement of any building or structure permanently annexed to the freehold, for any other purpose than to pay persons performing labor upon or furnishing material for such construction, repair, removal or improvement, shall be guilty of a misdemeanor in appropriating such funds to his own use while any amount for which he may be liable or become liable under his contract for such labor or materials remains unpaid, and may be prosecuted upon complaint of any person or persons who have not been fully paid any amount due them, and upon conviction shall be punished by a fine of not less than five hundred nor more than two thousand dollars, or by confinement in jail not less than thirty days nor more than twelve months, or by both such fine and imprisonment in the discretion of the jury or the court trying the case without a jury.

The use by any such contractor or subcontractor of any moneys paid to him under the contract, before paying all amounts due or to become due for labor performed or material furnished for such building or structure, for any other purpose than paying such amounts, shall be prima facie evidence of intent to defraud.

In any prosecution under this section the burden of going forward with the evidence shall be on the defendant to establish that all funds received by the defendant from the owner or his agent, the contractor or lender were used to pay persons performing labor upon or furnishing materials for such construction, repair, removal or improvement."

[3] Code § 43-19, in pertinent part, provides:

"Every assignment or transfer ... by a subcontractor of his contract with the general contractor, in whole or in part, or of any money or consideration coming to him under his contract with the general contractor, and every writ of fieri facias, attachment or other process against ... subcontractor to subject or encumber his interest arising under such contract, shall be subject to the liens given by this chapter to laborers, mechanics, and materialmen. No such assignment or transfer shall in any way affect the validity or the priority of satisfaction of liens given by this chapter."

[4] *National Bank of Detroit* v. *Eames,* 396 Mich. 611, 242 N.W.2d 412 (1976).

[5] *Panhandle Bank & Trust Co.* v. *Graybar Elec. Co.,* 492 S.W.2d 76 (Tex. Civ. App. 1973).

[6] *Schneider Fuel & Supply Co.* v. *West Allis State Bank,* 70 Wis.2d 1041, 236 N.W.2d 266 (1975).

consider a constitutional challenge to Code § 43-13. There we pointed out that the statute created "a moral obligation closely akin to a legal trust relation extending to both the owner and to those whose material or labor has entered into a structure, that the compensation paid therefor by the owner should not be misapplied." 193 Va. at 111, 67 S.E.2d at 879.

While this criminal statute creates a moral obligation, it contains no language creating a legal trust for the benefit of materialmen and laborers. Nor does the statute purport to affect or extend the rights and remedies otherwise available in a civil proceeding to materialmen and workmen under the mechanics' lien statutes. We therefore reject Kayhoe's trust fund argument.

Kayhoe's other argument, closely akin to its trust fund argument, is that Bank's security interest in C & T's receivables is subordinate to the liens of C & T's unpaid materialmen or subcontractors. This argument is grounded in Code § 43-19, and particularly the last sentence of the statute, which provides: "No such assignment or transfer shall in any way affect the validity or the priority of satisfaction of liens given by [the mechanics' lien laws]." Kayhoe also argues that the provisions of Code § 8.9-310[7] clearly demonstrate the intent of the Uniform Commercial Code that a perfected security interest will not be given priority over liens securing claims arising from work intended to enhance or preserve the value of the collateral.

Again we find no merit in Kayhoe's position. A mechanic's lien is purely a creature of statute. *Wallace* v. *Brumback,* 177 Va. 36, 39, 12 S.E.2d 801, 802 (1941). It has no existence in the common law, and, independently of statute, is unknown in equity. *Burks Pleading and Practice* § 455 (4th ed. 1952). Such a lien is a liability *in rem. Fairbanks, Morse & Co.* v. *Cape Charles,* 144 Va. 56, 61, 131 S.E. 437, 439 (1926).

But the same statutes which create a mechanic's lien also impose limitations on the amount for which such a lien may be perfected. Code § 43-7 provides that the amount for which a subcontractor may perfect a lien "shall not exceed the amount in which the owner is indebted to the general contractor at the time the notice is given, or shall thereafter become indebted to the general contractor upon his con-

---

[7] Code § 8.9-310 provides:

"When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, *a lien upon goods in the possession of such person* given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise." (Emphasis added)

tract. . . ." In the case of one performing labor or furnishing material to a subcontractor, the "lien . . . shall not exceed the amount for which such subcontractor could himself claim a lien. . . ." Code § 43-9.

In *John T. Wilson Co.* v. *McManus,* 162 Va. 130, 173 S.E. 361 (1934), in discussing the same provisions as they appeared in the ancestors of our present statutes, we pointed out:

> "It seems equally clear that the legislature has placed those who under agreement with a subcontractor perform work or furnish material used in the building on the same basis with such subcontractor. Before a subcontractor is entitled to claim a lien on a building he, under his contract with the general contractor, must have performed some work or furnished some material for which the general contractor is under contractual obligation to pay. The maximum amount for which he is entitled to claim a lien is governed by the condition of accounts between the owner and the general contractor at the time notice is given. If the general contractor is not indebted to the subcontractor, the subcontractor is not entitled to a lien. In fixing the amount of the lien to which persons performing labor or furnishing material to a subcontractor are entitled, the legislature has declared that such lien 'shall not exceed the amount for which said subcontractor could himself claim a lien.' The language is plain, unambiguous, and its meaning reasonably clear."

162 Va. at 135, 173 S.E. at 362-63.

By thus limiting the amount for which a mechanic's lien may be perfected by a subcontractor, or by those furnishing labor or materials to him, the General Assembly clearly recognized the practice common in the construction industry of making partial payments while construction is under way[8]. We hold, therefore, that, in the absence of fraud or wrongful conversion, Code § 43-19 does not affect disbursements against the contract price made before lien notice is given.

Code § 8.9-310, as can be seen from the italicized language in footnote 7, *supra,* and the Virginia Comment appended to that statute, has no application here as it deals only with liens attaching to personal property which is still in the possession of one who claims the lien.

For the reasons set forth below, the judgment of the trial court will be affirmed.

*Affirmed.*

---

[8] A subcontractor, laborer, or materialman who desires to further protect his lien may make the owner or general contractor personally liable by complying with the provisions of Code § 43-11, which first became a part of the Virginia Mechanics' Liens Law under Acts 1924, c. 435. This course was not taken in the case at bar.